**DWIGHT C. HOLTON**
United States Attorney, District of Oregon
**MICHELLE HOLMAN KERIN, OSB #965278**
Assistant United States Attorney
1000 S.W. Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1000
Michelle.Kerin@usdoj.gov
         Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON
Portland Division

| | |
|---|---|
| UNITED STATES OF AMERICA | No. CR 10-195-JO |
| v. | GOVERNMENT'S SENTENCING MEMORANDA REGARDING DEFENDANT JOEL ROSABAL |
| JOEL ROSABAL and CHADWICK AMSDEN, | |
| DEFENDANTS. | Hearing:  Wednesday, October 5, 2011, 10:30 a.m. |

The United States of America, by and through Dwight C. Holton, United States Attorney for the District of Oregon, and Michelle Holman Kerin, Assistant United States Attorney,  hereby submits this Sentencing Memorandum for the court to consider in sentencing defendant Joel Rosabal.  The government and the defendant recommend that the court sentence defendant to thirty-three (33) months imprisonment and three (3) years of supervised release.

I.      FACTUAL BACKGROUND

The parties agree that the Presentence Report (PSR) accurately reflects the events that were the basis for the charge against defendant.  Defendants Joel Rosabal and Chadwick Amsden were a team at Lighthouse Financial, a mortgage brokerage firm in Vancouver, Washington.

Defendant Rosabal was a skilled sales person who brought in potential borrowers and a savvy businessman. Defendant Amsden was a dedicated and intelligent loan officer who built relationships with lenders and borrowers to get any loan through to closing. Together, they were the highest producing loan officers at Lighthouse. They knew the mortgage industry well enough to know the system's inherent vulnerabilities and they took advantage of those vulnerabilities for their own profit and gain. During 2006 and 2007, defendants Rosabal and Amsden conspired together and with others to overinflate property values by as much as 20% or more in order to make cash kickbacks available for friends, acquaintances, and even themselves for buying homes. In order to succeed, they orchestrated their efforts with that of other real estate professionals including appraisers, home builders, realtors, accountants, loan processors, title and escrow companies, and of course the borrowers and sellers.

During the course of the conspiracy, defendants ensured that loan proceeds were paid to borrowers as incentives or cash "kickbacks." These cash kickbacks were not disclosed to the lender and ranged from approximately $8,000 to as much as almost $90,000. The way defendants achieved this was simple and involved material misrepresentations to the lender. Defendants would inform a borrower that if he or she purchased a specific home, they would receive a large cash payment at closing from the loan proceeds. The defendants would artificially inflate the sales price to the lender and the appraiser by the amount of the cash kickback. By artificially increasing the sales price, sellers received proceeds well above what they were asking for the home. The excess monies they received were given back to the borrowers but outside of title/escrow in order to keep lenders in the dark about the arrangement. In many of the transactions, the defendants had nearly complete control over the terms of the sale such that

Page 2 -    GOVERNMENT'S SENTENCING MEMO

neither the borrower nor the seller would know the purchase price represented to the lender or the amount of the cash kickback until closing. Once the lender funded the loan and paid the seller the "sales price" (after offsets), the seller would pay the borrower the agreed upon cash kickback. All of the agreements to provide these cash kickbacks were made outside of escrow and none of these agreements were disclosed to the lender or to the title company.

The transactions included material misrepresentations to induce the lender to approve the mortgage financing. Defendants Amsden and Rosabal directly manipulated the underwriting process in order to qualify their friends and others to purchase homes they would not have otherwise been able to buy. Some of their actions include:

- Temporarily depositing their own money into a borrower's bank account to show higher bank balances than what the borrower really had

- Drafting letters purportedly from borrowers which falsely claimed the borrowers' intention to purchase a home as their primary residence which allowed them to purchase a home for which they would not otherwise qualify

- Creating false rental agreements which indicated a borrower was collecting rent for another home they owned (frequently obtained by fraud)

- Intentionally omitting other real estate purchased by the borrower in the last 60-90 days on a loan application because it did not show up on the credit report

- Having others falsely pose as an employer for their borrowers or having them lie about the length of employment

- Significantly overstating a borrower's income

- Encouraging others to lie investigators about kickbacks given to borrowers

For example, defendants typically represented to lenders that a borrower intended to occupy a home as his or her primary residence, even when they knew that was not true. This was a material misrepresentation to the lender because many lenders, at the time, would allow 100%

Page 3 -   GOVERNMENT'S SENTENCING MEMO

financing for primary residences but would not permit such financing for investment property. In addition, lenders would provide discounted interest rates on loans financing a primary residence that were not offered for the purchase of investment homes. Defendants also aided borrowers significantly overstate their income and assets to lenders. Defendants would assist in creating false rental agreements for borrowers, false businesses and grossly inflating employment income. Defendants also obtained letters from an accountant that would falsely claim the accountant had reviewed the tax returns of a borrower that substantiated the false self-employment income or other asset of a borrower.

In many of the transactions, particularly those involving Adam Perkins,[1] defendants manipulated the timing of transactions in order to omit liabilities of borrowers to lenders. For example, from June 20, 2006 through August 30, 2006, a mere 70 days, defendants facilitated Adam Perkins' purchase eight pieces of real property (and all, except for one, of which Perkins declared, through the defendants in this case, to the lender would be his primary residence). In applications for these loans, defendants failed to disclose to the lenders all of the properties Perkins had purchased (and that defendants had obtained financing for). Because of the nature of real property transactions, it generally takes 60-90 days for a mortgage to appear on a credit score. The proximity of these transactions was purposefully designed by defendants Rosabal and Amsden to disguise the true nature of Perkins' liabilities to lenders–by ensuring multiple transactions occurred close in time, defendants ensured Perkins was able to purchase more properties. All of the properties defendants facilitated loans for as part of the charged conspiracy

---

[1] Mr. Perkins was convicted of wire fraud in *United States v. Perkins*, USDC Case No. 11-0165-HA. He was sentenced to twenty-one months imprisonment on September 19, 2011.

(except for one) ended in the borrower's default and eventual foreclosure by the lender for amounts significantly less than the amount the lenders financed.

## II.     GUIDELINES CALCULATION

There are no disputes regarding the advisory sentencing guidelines in this matter. The parties agree that the Probation Office properly calculated defendant's criminal history as Category I. The parties further agree that the base offense level is seven (7) pursuant to U.S.S.G. §2B1.1(a)(1)(A) and (B). The parties agree that an eighteen (18) level increase specific offense characteristics pursuant to U.S.S.G. §2B1.1(b)(1)(1)[2] and a two (2) level enhancement pursuant to U.S.S.G. §2B1.1(b)(2)(A)(I)[3] are both appropriate. The government also agrees that a downward departure of three (3) levels pursuant to U.S.S.G. §3E1.1 for the defendant's acceptance of responsibility, is appropriate. Finally, the government will move for a four (4) level downward departure pursuant to §5K1.1 for the defendant's timely cooperation. Accordingly, the appropriate guideline level is 20 and a guideline sentencing range of 33-41 months. After considering the factors of 18 U.S.C. §3553(a), the government and defendant recommend that the court impose a sentence of thirty-three (33) months followed by three (3) years of supervised release.

## III.    SENTENCE RECOMMENDATION

### A.     Legal Standard

The sentencing guidelines are advisory in nature. *United States v. Booker*, 543 U.S. 220 (2005). They are one of the statutory factors that sentencing courts must consider when

---

[2]The loss is more than $2,500,000 and less than $4,000,000.

[3]Defendant's criminal conduct resulted in financial loss to ten (10) or more victims.

Page 5 -       GOVERNMENT'S SENTENCING MEMO

imposing a sentence. *See* 18 U.S.C. §3553(a)(4); *United States v. Rita*, 551 U.S. 338 (2007). They serve as "the starting point and the initial benchmark" in every sentencing proceeding, *Gall v. United States*, 552 U.S. 38, 39 (2007), and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita*, 551 U.S. at 350. The remaining factors include the defendant's history and characteristics, the nature and seriousness of the offense, the need to provide just punishment and adequate deterrence, the need to promote respect for the law, and the need to protect the public from further crimes committed by the defendant. 18 U.S.C. §§3553(a)(1)-(2). They also include "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6). *See also Rita*, 551 U.S. at 347-48 (enumerating the statutory sentencing factors); *Gall*, 552 U.S. at 49 n.6 (same).

In *United States v. Carty*, 520 F.3d 984 (9th Cir.), *cert. denied sub nom. Zavala v. United States*, 128 S.Ct. 2491 (2008), the Ninth Circuit, sitting *en banc*, summarized the procedures a sentencing court must follow. The court must first correctly determine the applicable guideline range. *Id.* at 991. The court must also allow the parties to "argue for a sentence they believe is appropriate," and must "consider the §3553(a) factors to decide if they support the sentence suggested by the parties." *Id*. The court may not presume the guidelines are reasonable, and should not give them any more or any less weight than any other factor. *Id*. The court "must make an individualized determination based on the facts," and must explain its choice of sentence "sufficiently to permit meaningful appellate review." *Id.* at 991-92.

Page 6 -    GOVERNMENT'S SENTENCING MEMO

B.   Basis for Recommendation

The parties each recommend that the Court sentence this defendant to thirty-three months imprisonment, to be followed by three (3) years of supervised release.  The government believes that the proposed penalties are imperative to reflect the seriousness of defendant's crime, provide just punishment for the offense, promote respect for the law, to deter defendant from violating the law in the future and significantly, to deter the public from violating the law in the future.

1.   The Nature of Defendant's Crime and the Resulting Harm Requires A Thirty-Three Month Sentence.

A thirty-three (33) month sentence is fair and necessary to accomplish the goals of sentencing.  This court must consider the significant harm inflicted by defendants as a result of their serious fraud.  First, defendants' conduct is truly staggering given its breadth–in just a short time, defendants facilitated at least twenty-four (24) transactions that involved cash kickbacks and/or significant material false statements to lenders that induced them to finance loans exceeding $11.4 million.  Second, this defendant was well aware of the criminal nature of his conduct throughout the course of his scheme to defraud lending institutions.  In addition to the misrepresentations to the lenders, defendant purposefully used other tactics to conceal his duplicity.  For example, he instructed buyers to use different color ink when signing papers for different properties on the same day and he assisted Adam Perkins prepare an elaborate story to tell lenders and law enforcement if they discovered his lies.  Third, the loss to lending institutions as a result of defendants' fraudulent conduct is over $3.8 million–a significant loss in a mortgage fraud case in this district.  If defendants had robbed a bank of $3.8 million, there would be little doubt the outcome of their sentence.  "White-collar offenders * * * should not escape the same punishment [as other criminals] simply because they are better-positioned to make a sympathetic

presentation to the judge." *United States v. Edwards*, 622 F.3d 1215, 1217 (9th Cir. 2010)(Gould, dissent from motion for rehearing *en banc*).

It is not sufficient to say, as defendant does, that others were engaged in the same conduct. It is not sufficient to say that lenders looked the other way at borrowers' duplicity.[4] Defendant Rosabal notes in his Sentencing Memo that the financial services industry was a "train-wreck" and it appeared that everyone in the mortgage industry was "doing 90" mph on the freeway.[5] However, the conduct of these defendants gamed and manipulated an imperfect system in a way that wreaked havoc on this community. If everyone in the mortgage business was doing 90 mph on the freeway back in the day, it is clear from the facts here that the defendants were doing 120 mph. The defendants artificially raised sales prices of real property to ensure buyers received cash in direct contravention of lending guidelines and the lenders' standard standing escrow instructions. Defendants kept sellers in the dark in order to maximize the cash kickback and control the information between the various parties. The defendants facilitated and ensured that borrowers purchased significantly more and bigger homes than they could afford. They did

---

[4] It is significant that throughout the course of this investigation, without exception, each and every lending institution, including those with very liberal lending policies, indicated that had defendant disclosed the cash he was receiving from the seller, they would not have made the loan. Most lenders have standing instructions at escrow that a seller is limited in the amount they can give the buyer–precisely because it indicates that the lender's collateral, i.e. the home, is not worth the amount financed. Moreover, in addition to a borrower's income, lenders also pulled credit reports, bank statements, verified that borrowers had been employed with their current employer for two years or longer, had borrowers write letters supporting their intentions to live in their home as their primary residence, and verified rents borrower's had paid previously. Because of the nature and breadth of the false statements defendants used in their criminal conspiracy, it would have been difficult for lenders to know if a letter was false, or a signature forged, or that a borrower in fact owned more property than was disclosed on their credit report.

[5] Defendant's Sentencing Memo, p. 8.

Page 8 -      GOVERNMENT'S SENTENCING MEMO

this by lying to lenders about the borrowers' assets and liabilities and the true nature of the transactions. Predictably, almost all of the buyers in these cash kickback transactions were not able to keep up with the payments–those homes were foreclosed and then sold for significantly less than what the defendants induced lenders to finance.

Defendants conduct is a microcosm of the conduct that led, in part, to the country's very serious recession, the precipitous decline of our community's real estate values and the depreciation of the value of individuals in this district's primary asset, their home.[6] An overview of the decline of housing prices may be helpful for the court to see how mortgage fraud and foreclosures have impacted our community. From July 2007 to approximately July 2010 (three months after this case was indicted), median home prices in the Portland, Oregon metro area went from $301,000 to $235,000[7] and are even lower today.[8] In some of the specific communities in which the defendants facilitated the financing of homes through fraud and the use of cash kickbacks, the decline is even more staggering. In Happy Valley, Oregon for example, in July 2007, the median home price was $413,000;[9] in July 2010, it was $301,000.[10] Below is a chart demonstrating the significant decline:[11]

---

[6] See, http://en.wikipedia.org/wiki/Subprime_mortgage_crisis (Noting that the defaults on sub-prime mortgages in 2007 was one of the first indicators of the financial crisis of the late 2000's).

[7] http://www.zillow.com/local-info/OR-Portland-home-value/r_13373/

[8] Today the median home price is $230,000. *Id.*

[9] http://www.zillow.com/local-info/OR-Happy-Valley-home-value/r_31937/

[10] *Id.*

[11] *Id.*

Page 9 -    GOVERNMENT'S SENTENCING MEMO



On a more micro level, the defendants used materially false statements to induce lenders to finance four (4) home on one street--SE Nature Way in Milwaukie, Oregon. The cash kickbacks that borrowers and others received in these transactions, i.e. the amount sales prices were inflated to lenders, is over $316,000. Below is an overview of the decline of the fair market value on a street that lies just behind SE Nature Way, SE George Court:[12]

| Address | Home Value: Oct06 | Home Value: Jul07 | Home Value: Jul11 | Total Price Decline (%) |
|---|---|---|---|---|
| 5221 SE George Ct. | $246,000 | $250,000 | $179,000 | 39.4% |
| 5240 SE George Ct. | $263,000 | $283,000 | $196,000 | 44.4% |
| 5241 SE George Ct. | $236,000 | $248,000 | $176,000 | 41.0% |
| 5260 SE George Ct. | $252,000 | $268,000 | $175,000 | 53.1% |
| 5261 SE George Ct. | $252,000 | $277,000 | $146,000 | 89.7% |

---

[12]According to http://www. zillow.com

Page 10 -   GOVERNMENT'S SENTENCING MEMO

The government recognizes that there are certainly many other complex factors which caused real estate prices to fall since 2006 and 2007, however the defendants' actions, and others who assisted them, cannot be overlooked.  The point is this: the harm to lenders as a result of the defendants' criminal conduct is measurable and precise.  The harm to our community and the citizen's of this district is just as real, though less quantifiable.

It is true that the defendants appear remorseful for their actions.  As is the case with many criminals, there is a side to these intelligent, relatively-privileged, young men that is good and decent.  Yet the actions of the defendants have victimized others and harmed uncounted homeowners for which they need to be held accountable.  At their worst, defendants Rosabal and Amsden, had a complete disregard of law and allowed their greed to rule the day.  As if it were a joke, they encouraged borrowers to buy several homes for millions of dollars within a short period of time, at times sight unseen, with the allure of cash kickbacks.  Given the seriousness of the defendants' offense, the nature of the offense and in order to promote just punishment for the offense, a prison term of thirty-three (33) months and a supervised release period of three (3) years is necessary.

> 2. <u>The Recommended Sentence Is Necessary to Avoid Unwarranted Sentence Disparities Among Defendants Who Have Been Found Guilty of Similar Conduct.</u>

The criminal conduct and resulting investigation involving Lighthouse, an apparent den of criminal conduct during the real estate boom, has resulted in eight (8) convictions to date.  The criminal investigation is ongoing and three (3) more defendants are currently under indictment in *U.S. v. Amsden, et al.*, USDC Case No. 10-CR-196-KI.  After the two defendants in this case are sentenced, seven (7) of those defendants will have been sentenced by various judges in this

Page 11 -    GOVERNMENT'S SENTENCING MEMO

district.[13] Defendants were two of the lead figures at Lighthouse–they were the top loan officers and made millions of dollars in commissions during their run. Given the defendants' relative culpability and role at Lighthouse, a sentence of thirty-three (33) months is fair, just and does not create unwarranted disparity compared with others who engaged in similar criminal conduct. Below is a chart outlining the sentences others have received for their criminal conduct involving Lighthouse. It includes the recommended sentences for the defendants in this case:

| **Defendant/ USDC Case No.** | **No. of prop- erties** | **Charge Defendant Convicted Of** | **Sentence/ Recommended** | **Notes** |
|---|---|---|---|---|
| **Marty Folwick** 08-CR-280-KI | 71 | Wire Fraud (x2), Bank Fraud, Money Laundering | 63 mos. | Loss to lenders could not be accurately calculated for sentencing purposes and an alternative mechanism to determine loss was used. |
| **Chad Amsden** 10-CR-195-JO | 24 | Conspiracy-Wire Fraud | 33 mos. **recommended** | |
| **Joel Rosabal** 10-CR-195-JO | 24 | Conspiracy-Wire Fraud | 33 mos. **recommended** | |
| **Kamau Herndon** 09-CR-68-KI | 3 | Agg. ID Theft | 24 mos. | |
| **Adam Perkins** 11-CR-165-HA | 11 | Wire Fraud (x2) | 21 mos. | |

---

[13]Tim Hills, a defendant in *U.S. v. Amsden, et al.*, USDC Case No. 10-CR-196-KI, and defendants Rosabal and Amsden's business partner, has plead guilty to conspiracy to commit bank fraud and is currently set for sentencing before Judge King on November 3, 2011.

Page 12 -     GOVERNMENT'S SENTENCING MEMO

| | | | | |
|---|---|---|---|---|
| **Chael Sonnen**<br><br>10-CR-152-MO | 5 | Money Laundering | Probation, Fine, Loss of real estate license | Acted as a realtor in transactions, no direct dealing with lenders, did not profit directly from cash kickbacks |
| **Kristen Buse**<br><br>08-CR-283-KI | 1 | Wire Fraud | Probation | First to come in and cooperate with law enforcement, provided significant information, no professional real estate license. |

As the court can see, the recommended sentence is necessary to ensure there is no unwarranted disparity between similarly situated individuals. Adams Perkins, an individual who purchased eleven (11) properties that defendants secured financing and cash kickbacks of over $326,000 in eight (8) months, was sentenced just this week to twenty-one (21) months. Given the defendants' relative culpability as compared to others, a sentence of thirty-three (33) months is appropriate to ensure there is not unwarranted disparity with others who engaged in the same criminal conduct.

      3.      <u>A Thirty-Three Month Sentence Promotes Specific and General Deterrence.</u>

A thirty-three month (33) sentence of imprisonment promotes both specific and general deterrence. First, the sentence recommended by both parties is likely to deter the defendant from engaging in any kind of criminal conduct in the future. General deterrence in particular would be served by the sentence recommended by both parties, thirty-three (33) months. "General deterrence is effective in the context of white collar crime." *United States v. Edwards*, 595 F.3d 1004, 1021 (9th Cir. 2009)(BEA, dissenting). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

Page 13 -      GOVERNMENT'S SENTENCING MEMO

"White collar crime, especially bank fraud, usually requires a well-schooled, intelligent criminal, capable of gauging the upside of how others will be gulled by his well-honed fables. This ability to foresee extends also to the possible downside of his fraud: apprehension, conviction, and punishment." *Edwards*, 595 F.3d at 1021 (BEA, dissenting). Criminals who seek to manipulate and risk the stability of our lending institutions and housing market must understand that there are serious consequences for such conduct. A thirty-three (33) month sentence of imprisonment and three (3) years supervised release for defendant Rosabal will do just that.

## IV.    RESTITUTION

The government seeks $2,134,134.45 in restitution pursuant to the Mandatory Victims Restitution Act. The government has provided the United States Probation Office with a spreadsheet identifying the lending institutions who own the loss for a portion of the defendants' criminal conduct. The lenders for other properties in which the government is not seeking restitution were either non-responsive to the government's requests for information substantiating their loss or the owner of the loss could not be determined after diligent search. This information was provided to the U.S. Probation Office and defendants approximately two-weeks ago. The government provided the defendants with the direct contact information for many of the lending institutions as well as an opportunity to meet with government agents to go over these figures.[14] If the defendant objects to restitution prior to or at the hearing, the government requests additional time (on the restitution issues only) in order to fully analyze the defendant's objections, file responsive documents and if necessary, call witnesses.

---

[14] The plea agreement between the parties requires the defendant to pay full restitution for his crimes. It directs the government to provide an amount of restitution prior to sentencing. The government has more than met its obligation under the plea agreement.

Page 14 -    GOVERNMENT'S SENTENCING MEMO

V.  **CONCLUSION**

The government and the defendant recommend that the proposed sentence of a thirty-three month prison term and three (3) years of supervised release are imperative to reflect the seriousness of defendant's crime, provide just punishment for the offense, promote respect for the law, and deter defendant and others from violating the law in the future.  18 U.S.C. §§ 3553(a)(2)(A) and 3553(a)(2)(B).

Dated this 29th day of September, 2011.

Respectfully submitted,

DWIGHT C. HOLTON
United States Attorney
District of Oregon

*/s/ Michelle Holman Kerin*
MICHELLE HOLMAN KERIN
Assistant United States Attorney

Page 15 -   GOVERNMENT'S SENTENCING MEMO