IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> JOEL ROSABAL ) <br> AND ) <br> CHADWICK AMSDEN, ) <br> ) <br> Defendants. ) | 3:10-CR 00195-JO <br><br> OPINION AND ORDER |

JONES, J.

    This Court must determine the amount of restitution to be paid by defendants Joel Rosabal and Chadwick Amsden in accordance with the Mandatory Victims Restitution Act (MVRA). 18 U.S.C. § 3663A (2012). The restitution amount is $354,233.74. The defendants are jointly and severally responsible for this sum.

-1- OPINION AND ORDER

## BACKGROUND

The defendants worked together at a brokerage company where they filed fraudulent mortgage documents with lenders to procure mortgages for customers. The brokerage submitted false information to lenders, including borrowers' incorrect debt statuses and incomes. On March 18, 2010, a grand jury indicted each defendant for twenty-one counts relating to this mortgage fraud conspiracy.

Defendant Rosabal entered into a plea agreement on December 2, 2010. In exchange for his plea of guilty to Count 1, Conspiracy to Commit Mail and Wire Fraud under 18 U.S.C. § 1349, the Government dismissed the other twenty counts. Rosabal also agreed to pay full restitution to the victims of his scheme. On October 14, 2011, Rosabal was sentenced to thirty-three months' imprisonment with five years of supervised release. Defendant Amsden entered into a similar plea agreement on May 11, 2011, and was sentenced to twenty-seven months' imprisonment with five years of supervised release. Amsden's restitution was held jointly and severally with Rosabal.

To prove the restitution amount, the Government solicited information from the victims regarding their losses directly and proximately resulting from the defendants' conspiracy. Only Bank of America, servicer of four of the fraudulently obtained loans,[1] provided information. The information was in the form of a one-page spreadsheet specifying the investor who owned the loan, the amount for which the loans were purchased, the unpaid principal balance, the unpaid interest, the proceeds from foreclosure sales of the collateral properties, and a mathematical determination of the

---

[1] While it is uncertain how many fraudulently obtained loans the scheme produced, unrebutted estimates ranged from twenty-four to forty. Internal Revenue Service Special Agent Abraham Smith prepared some information regarding fourteen of the loans that was entered into evidence.

investors' total losses. The spreadsheet was prepared and signed by Bank of America employee Elizabeth Tooley on February 16, 2012. The figures were largely identical to the evidentiary testimony given by Internal Revenue Service Special Agent Abraham Smith on January 4, 2012.

However, Ms. Tooley's affidavit did not include the appraised value of the real property collateral on the date each victim gained possession. This value was paramount to calculating victims' loss under *United States v. Yeung*, 672 F.3d 594 (9th Cir. 2012), while the figure used on the spreadsheet, the actual amount paid, was irrelevant. This Court refused to order restitution without the appraised valuation and ordered further investigation on February 7, 2013.

The Government provided the requested information on May 8, 2013, in the form of a chart closely resembling Ms. Tooley's February 2012 affidavit with modified columns to show the appraisal date and amount for each collateral property. The chart did not appear in the form of an affidavit, and on August 12, 2013, this Court again declined to issue an order of restitution absent a sufficiently detailed victim affidavit. *See United States v. Waknine*, 543 F.3d 546, 557 (9th Cir. 2008). The Government responded by submitting the same chart on October 10, 2013, appended with Ms. Tooley's signature and a statement that she understood that a false statement would subject her to the penalties of perjury.

On October 30, 2013, this Court deferred ruling in anticipation of the Supreme Court's pending decision in *Robers v. United States*, 134 S.Ct. 1854 (2014). The *Robers* decision was delivered on May 5, 2014, and abrogated part of the *Yeung* framework, finding the amount paid for a loan to be the relevant inquiry rather than the appraisal

value. *Robers*, 134 S.Ct. at 1856. In response, the Government reasserted the values within Ms. Tooley's February 2012 affidavit and demanded restitution based on its figures. The defendants continue to contest the evidentiary adequacy of Ms. Tooley's affidavits.

## LEGAL STANDARD

The MVRA provides that restitution involving damage or loss of property requires the return of such property. 18 U.S.C. 3663A(b)(1)(A). However, if returning the property is impracticable or impossible, the victim must be compensated in an amount equal to the value of his loss minus the value of any property returned. 18 U.S.C. 3663A(b)(1)(B)(i); *Robers*, 134 S.Ct. at 1856. The value of the property returned in the context of a mortgage is "the amount of money the victim received in selling the collateral, not the value of the collateral when the victim received it." *Robers*, 134 S.Ct. at 1854.

The primary goal of restitution under the MVRA is to make the victim whole. *United States v. Carter*, 742 F.3d 440 (9th Cir. 2014); *see* 18 U.S.C. 3663A. Awarding a victim an amount greater than his actual loss constitutes plain error. *Yeung*, 672 F.3d at 602 (citing *United States v. Rizk*, 660 F.3d 1125, 1137 (9th Cir. 2011)), *abrogated on other grounds by Robers*, 134 S.Ct. 1854. In addition, "Congress intended the restitution process to be quick and reasonable," and district courts are permitted a degree of flexibility in making restitution determinations. *United States v. Gordon*, 393 F.3d 1044, 1053 (9th Cir. 2004). Despite this flexibility, district courts must establish facts by a preponderance of the evidence, utilizing "only evidence that possesses sufficient indicia of reliability to support its probable accuracy." *United States v. Waknine*, 543 F.3d 546,

557 (9th Cir. 2008) (quoting *United States v. Garcia-Sanchez*, 189 F.3d 1143, 1148-49 (9th Cir. 1999)) (internal quotations omitted). Victim affidavits are generally, but not always, sufficient to prove reliability. *Waknine*, 543 F.3d at 557-58.

### DISCUSSION

**I.   Restitution Amount**

Restitution is the amount the victims lost purchasing fraudulently obtained loans minus the amount the victims recovered by selling the collateral. *See* 18 U.S.C. 3663A(b)(1); *Robers*, 134 S.Ct. at 1854. The victims' losses are reflected by the amount paid for the fraudulent loans, totaling $1,412,107.96. *See Robers*, 134 S.Ct. at 1856. The victims recovered a total of $1,057,874.22 from the foreclosure sales of the collateral. Thus the total restitution amount is $354,233.74.[2]

The Government contends that the restitution amount should include the unpaid interest on the loans. This argument misunderstands the concept of restitution and the dictates of court precedent. Restitution under the MVRA is designed to make victims whole, and thus punishing the defendants by awarding restitution greater than the victims' losses is improper. *See Rizk*, 660 F.3d at 1137; *Gordon*, 393 F.3d at 1052-53 n.6. Granting an amount of restitution greater than the amount the victims paid would go beyond restoring the victims to their positions before coming into possession of the fraudulently obtained loans. Moreover, *Robers* indicates that loss in the mortgage

---

[2] These totals do not rely on the government's or Bank of America's mathematics but were calculated by this Court using reliable objective figures in the record, as explained in Section II.

The cost to purchase servicing for each of the four loans was $556,518.16, $306,000.00, $371,749.80, and $177,840.00. The total cost was therefore $1,412,107.96.

The amount recovered by the foreclosure sale of each of the collateral properties was $331,068.49, $244,647.23, $338,158.50, and $144,000.00. The total amount of returned property was therefore $1,057,874.22.

context is the amount of money paid. *See Robers*, 134 S.Ct. at 1857. Because a direct lender is entitled to restitution equal to the amount lent rather than the total value of the promise, it follows that an investor would be entitled only to the amount spent to purchase the fraudulently obtained loan. *See Robers*, 134 S.Ct. at 1857. Similarly, it is undisputed that the unpaid principal balance on the loans is irrelevant because it is unrelated to the amount the victims paid, and likewise there appears no rationale to justify including unpaid interest.

## II. Quality of the Government's Evidence

### a. Inconsistencies

The defendants cite to inconsistencies in the Government's evidence as reason to reject it. They further point out that some of the figures in Ms. Tooley's affidavits do not add up correctly. The defendants believe that, as a result, the evidence is unreliable and a restitution order cannot rely on it.

After closely scrutinizing Ms. Tooley's affidavits and comparing them to each other and the figures Agent Smith compiled, this Court concludes that the inconsistencies defendants point to are either minimal or inconsequential. Ms. Tooley's October 2013 affidavit undercalculates the total restitution amount by $0.77, an error of 0.0001% in the defendants' favor. A more serious miscalculation exists in the October 2013 affidavit's tallying of the collateral's appraisal value. There the calculation included the sale proceeds for one of the properties rather than the appraisal value, resulting in an almost $100,000 windfall to the victims.[3] This error is harmless because the collateral properties' appraisal values are irrelevant. *See Robers*, 134 S.Ct. 1854. This Court

---

[3] The appraisal rate for loan 141871145's collateral property was $430,000.00, but the chart erroneously used the $331,068.49 sale value in its calculation of the total appraisal value for the four collateral properties.

context is the amount of money paid. *See Robers*, 134 S.Ct. at 1857. Because a direct lender is entitled to restitution equal to the amount lent rather than the total value of the promise, it follows that an investor would be entitled only to the amount spent to purchase the fraudulently obtained loan. *See Robers*, 134 S.Ct. at 1857. Similarly, it is undisputed that the unpaid principal balance on the loans is irrelevant because it is unrelated to the amount the victims paid, and likewise there appears no rationale to justify including unpaid interest.

## II. Quality of the Government's Evidence

### a. Inconsistencies

The defendants cite to inconsistencies in the Government's evidence as reason to reject it. They further point out that some of the figures in Ms. Tooley's affidavits do not add up correctly. The defendants believe that, as a result, the evidence is unreliable and a restitution order cannot rely on it.

After closely scrutinizing Ms. Tooley's affidavits and comparing them to each other and the figures Agent Smith compiled, this Court concludes that the inconsistencies defendants point to are either minimal or inconsequential. Ms. Tooley's October 2013 affidavit undercalculates the total restitution amount by $0.77, an error of 0.0001% in the defendants' favor. A more serious miscalculation exists in the October 2013 affidavit's tallying of the collateral's appraisal value. There the calculation included the sale proceeds for one of the properties rather than the appraisal value, resulting in an almost $100,000 windfall to the victims.[3] This error is harmless because the collateral properties' appraisal values are irrelevant. *See Robers*, 134 S.Ct. 1854. This Court

---

[3] The appraisal rate for loan 141871145's collateral property was $430,000.00, but the chart erroneously used the $331,068.49 sale value in its calculation of the total appraisal value for the four collateral properties.

instead calculated the total restitution award from the relevant figures in Ms. Tooley's February 2012 affidavit, where the totals are correctly added. Furthermore, this Court's restitution order does not rely on the affidavits' calculated totals but instead totals derived from objective evidence in the record. The alleged totals are conclusory and are neither adequate as evidence nor necessary to reach a determination. *See Waknine*, 543 F.3d at 557. For the purposes of the final restitution calculation, this court ignores Ms. Tooley's affidavits' totals calculations.

The February 2012 affidavit also bears an arithmetic error, inflating the total loss by well over $100,000.[4] These poorly tallied figures do not destroy the objective evidence's validity. Bank of America's lack of mathematical prowess does not automatically delegitimize the raw figures.

The objective figures in Ms. Tooley's February 2012 affidavit are inconsistent with Agent Smith's investigation in just one instance, overcalculating the sale proceeds by over $6,500 for one of the foreclosure sales.[5] Thus the restitution order would be greater if it employed Agent Smith's figures instead of the February 2012 affidavit's figures. *See* 18 U.S.C. 3663A(b)(1)(B); *Robers*, 134 S.Ct 1854. This Court elects to rely on Ms. Tooley's figures because they were provided first-hand by an employee within Bank of America and because it contradicts common sense to award a financial institution a potential windfall as a result of its internal clerical error that a third party

---

[4] The loans' unpaid principal balances, rather than the loans' purchase prices, were the figures used to calculate this total and totaled to an amount larger than the total of the purchase prices. The unpaid principal balance on each of the loans was $539,733.88, $340,000.00, $358,400.00, and $197,00.00. This totals $1,435,733.88. The unpaid interest on each loan was $78,763.01, $74,658.23, $29,635.20, and $25,194.06, totaling $208,250.50. The result of subtracting the total sales proceeds from the total unpaid principal balance and the total unpaid interest is $586,110.16, not the $695,202.84 alleged.

[5] Ms. Tooley's affidavit states the collateral property for loan 151936696 sold for $338,158.50 while Agent Smith's information states the property sold for $331,475.50. In every other instance where there is overlap, the February 2012 affidavit and Agent Smith's investigation are completely consistent.

investigator uncovered. Because the February 2012 affidavit is consistent in all other relevant respects with Agent Smith's investigative findings, they support each other's evidentiary value and this Court sees no cause to reject either of them.

### b. Reliability

The defendants claim that Ms. Tooley's February 2012 affidavit is unreliable with respect to the loans' purchase costs to the victims. They cite Agent Smith's testimony at length, emphasizing his statements that information regarding the amount the victims paid for the fraudulent loans was difficult to obtain. The defendants further argue Ms. Tooley's October 2013 affidavit should be rejected because it provides information that is all but identical to an unsigned chart this Court found unreliable in August 2013.

While district courts generally possess substantial flexibility when assessing restitution amounts, a district court may order a restitution award only when supported by evidence possessing a sufficient indicia of reliability. *Waknine*, 543 F.3d at 557. A victim affidavit usually possesses a sufficient indicia of reliability, but in extraordinary circumstances such evidence may not be enough if it is too conclusory and alleges information a defendant would not reasonably be able to counter. *See Waknine*, 543 F.3d at 557-58 (rejecting a victim's one-page affidavit stipulating attorney's fees and investigative costs as too conclusory and unreasonable for a defendant to counter).

Ms. Tooley's February 2012 affidavit satisfies the *Waknine* standard. Ms. Tooley's affidavits, unrebutted by other evidence in the record, are victim affidavits that are generally admissible evidence under *Waknine*. *See Waknine*, 543 F.3d at 557. Moreover, the information in Ms. Tooley's February 2012 affidavit finds support in Agent Smith's testimony and evidence, as discussed above. Agent Smith's testimony did

not indicate, as the defendants claim, that the amount the victims spent to purchase the fraudulent loans would be impossible to find. Agent Smith did not uncover such information because he did not pursue it, focusing instead on the unpaid principal balance on the loans at the time of purchase, which was relevant under the then-prevailing *Yeung* standard. In light of the *Robers* decision, Agent Smith's failure to uncover information regarding the purchasing price for the loans is now irrelevant.

The defendants also point out that this Court found that Ms. Tooley's February 2012 affidavit was insufficient evidence in a February 7, 2013, order. The defendants misconstrue why this Court found the evidence inadequate. The affidavit lacked information as to the value of the collateral properties at the time of the loan's purchase, a value no longer relevant to the restitution calculation. *Robers*, 134 S.Ct. 1854. After *Robers*, this Court's objection to the February 2012 affidavit no longer presents an issue.

## CONCLUSION

The defendants are jointly and severally liable for $354,233.74.

IT IS SO ORDERED.

DATED this 22↲ day of July, 2014.

Robert E. Jones
United States District Judge

-9-  OPINION AND ORDER